1  **TIFFANY & BOSCO, P.A.**
   Richard G. Himelrick (#004738)
2  Seventh Floor Camelback Esplanade II
   2525 East Camelback Road
3  Phoenix, Arizona 85016
   Telephone: (602) 255-6000
4  Facsimile: (602) 255-0103
   E-mail:  rgh@tblaw.com
5
6
   **GLANCY PRONGAY & MURRAY LLP**
7  Lionel Z. Glancy
   Robert V. Prongay
8  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
9  Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
10 E-mail: lglancy@glancylaw.com; rprongay@glancylaw.com
11
12 Attorneys for Plaintiff
13
14                 UNITED STATES DISTRICT COURT
15                      DISTRICT OF ARIZONA
16
   Miguel Avila, Individually and on Behalf      Case No.
17 of All Others Similarly Situated,
                                                 **CLASS ACTION COMPLAINT FOR**
18              Plaintiff,                        **VIOLATIONS OF THE FEDERAL**
                                                 **SECURITIES LAWS**
19         v.
20
   LifeLock, Inc.; Todd Davis; and Chris         **JURY TRIAL DEMANDED**
21 Power,
22
                Defendants.
23
24
25
26
27
28

Miguel Avila ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by LIFELOCK, INC. ("LifeLock" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by LifeLock; and (c) review of other publicly available information concerning LifeLock.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of those who purchased or otherwise acquired LifeLock's securities between July 30, 2014 and July 20, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. LifeLock provides identity theft protection services for consumers and fraud and risk solutions for enterprises. LifeLock's threat detection, proactive identity alerts, and comprehensive remediation services purportedly provide peace of mind for consumers amid the growing threat of identity theft. The LifeLock Wallet™ mobile app helps consumers manage their identity and payment cards on the go and enables LifeLock members to receive alerts and services on their digital device. Leveraging data, science and patented technology from ID Analytics, Inc., a wholly-owned subsidiary, LifeLock offers identity theft protection. To help fight identity theft, LifeLock claims to work to train law enforcement and partners with a variety of non-profit organizations to help consumers establish positive habits to combat this threat.

3. Throughout the Class Period, defendants represented that the Company was in compliance with a 2010 settlement ("2010 Settlement") it had entered into with the Federal Trade Commission ("FTC") regarding the Company's advertising and other representations about its business and services. Moreover, the Defendants maintained that their settlement with the FTC was based on earlier practices and technology

employed by the Company and, therefore, only related to the earlier practices. The Defendants gave the impression that the Company was in full compliance with the settlement with the FTC and that its present technology and services supported the representations made by the Company in its advertising.

4.     In fact, during the Class Period, the Company was not in compliance with its FTC settlement, nor did the technology employed by the Company support the claims in the Company's advertising. Through selective misstatements and omissions, the Defendants materially misrepresented to the market that it was in compliance with the FTC settlement and that it had changed its practices to stay in compliance and offer the protection against identity theft and identity fraud that the Company advertised.

5.     On July 21, 2015, the FTC revealed in a press release that LifeLock violated a 2010 settlement with the agency and 35 state attorneys general by continuing to make deceptive claims about its identity theft protection services, and by failing to take steps required to protect its users' data.

6.     On this news, shares of LifeLock declined $7.91 per share, nearly 50%, to close on July 21, 2014, at $8.15 per share, on unusually heavy volume.

7.     Throughout the Class Period, Defendants made false and/or misleading statements regarding the Company's services and compliance with the FTC settlement, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had failed to establish and maintain a comprehensive information security program to protect its users' sensitive personal data, including credit card, social security, and bank account numbers; (2) that the Company falsely advertised that it protected consumers' sensitive data with the same high-level safeguards as financial institutions; (3) that the Company failed to meet the 2010 Settlement's recordkeeping requirements; and, (4) that, as a result of the foregoing, the Company's statements about its business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired LifeLock's common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant LifeLock is a Delaware corporation with its principal executive offices located at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281.

15. Defendant Todd Davis ("Davis") was, at all relevant times, the

Company's Chairman and Chief Executive Officer.

16.     Defendant Chris Power ("Power") was, at all relevant times, the Company's Chief Financial Officer.

17.     Defendants Davis and Power are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LifeLock's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     LifeLock provides identity theft protection services for consumers and fraud and risk solutions for enterprises. LifeLock's threat detection, proactive identity alerts, and comprehensive remediation services purportedly provide peace of mind for consumers amid the growing threat of identity theft. The LifeLock Wallet™ mobile app helps consumers manage their identity and payment cards on the go and enables LifeLock members to receive alerts and services on their digital device. Leveraging data, science and patented technology from ID Analytics, Inc., a wholly-owned subsidiary, LifeLock offers identity theft protection. To help fight identity theft, LifeLock claims to works to train law enforcement and partners with a variety of non-

profit organizations to help consumers establish positive habits to combat this threat.

**Materially False and Misleading
Statements Issued During the Class Period**

19.    The Class Period begins on July 30, 2014.  On this day, the Company issued a press release entitled, "LifeLock Announces 2014 Second Quarter Results." Therein, the Company, in relevant part, stated:

> LifeLock, Inc. (NYSE: LOCK), an industry leader in identity theft protection, today announced financial results for the second quarter ended June 30, 2014.
>
> **Second Quarter 2014 Financial Highlights:**
>
> • **Revenue**: Total revenue was $115.7 million for the second quarter of 2014, up 29% from $89.5 million for the second quarter of 2013. Consumer revenue was $109.3 million for the second quarter of 2014, up 32% from $82.6 million for the second quarter of 2013. Enterprise revenue was $6.4 million for the second quarter of 2014, compared with $6.9 million for the second quarter of 2013.
>
> • **Net Loss**: Net loss was $2.8 million for the second quarter of 2014, compared with net loss of $2.1 million for the second quarter of 2013. Net loss per diluted share was $0.03 for the second quarter of 2014 based on 92.5 million weighted-average shares outstanding, compared with net loss per diluted share of $0.02 for the second quarter of 2013 based on 87.5 million weighted-average shares outstanding.
>
> • **Adjusted Net Income**: Adjusted net income was $4.6 million for the second quarter of 2014, compared with an adjusted net income of $3.2 million for the second quarter of 2013. Adjusted net income per diluted share was $0.05 for the second quarter of 2014 based on 97.9 million weighted-average shares outstanding, compared with an adjusted net income of $0.03 per diluted share for the second quarter of 2013 based on 94.9 million weighted-average shares outstanding.
>
> • **Adjusted EBITDA**: Adjusted EBITDA was $6.7 million for the second quarter of 2014, compared with $4.6 million for the second quarter of 2013.
>
> • **Cash Flow**: Cash flow from operations was $27.7 million for the second quarter of 2014, leading to free cash flow of $24.0 million after taking into consideration $3.7 million of capital expenditures. This compares with cash flow from operations of $20.8 million and free cash flow of $18.4 million, after taking into consideration $2.4 million of capital expenditures, for the second quarter of 2013.

- **Balance Sheet**: Total cash and marketable securities at the end of the second quarter of 2014 was $216.0 million, up from $191.2 million at the end of the first quarter of 2014.

"Our business performed strongly again in the second quarter," said Todd Davis, LifeLock's Chairman and CEO. "In addition, we launched a significant expansion of our product portfolio that we believe will provide additional value for our members, further differentiating our products in the market and expanding our lead versus our competitors in the legacy credit monitoring space."

## Second Quarter 2014 & Recent Business Highlights:

- Launched the next evolution in our service suite with the release of LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus. With our LifeLock Ultimate Plus offering, LifeLock is now the only identity theft company that can monitor across its network to provide alerts across a more complete cross-section of consumers' financial lives including credit cards, checking, savings, and investment accounts.

- Recorded the 37th consecutive quarter of sequential growth in revenue and cumulative ending members.

- Added approximately 304,000 gross new members in the second quarter of 2014 and ended the quarter with approximately 3.39 million members.

- Achieved a retention rate of 87.2% for the second quarter of 2014, compared with 87.4% for the second quarter of 2013.

- Increased monthly average revenue per member to $10.99 for the second quarter of 2014 from $10.18 for the second quarter of 2013.

## Guidance:

As of July 30, 2014, we are initiating guidance for our third quarter of 2014 as well as updating our guidance for the full year 2014.

- **Third Quarter 2014 Guidance**: Total revenue is expected to be in the range of $119 million to $121 million. Adjusted net income per share is expected to be in the range of $0.14 to $0.15 based on approximately 100 million fully diluted weighted-average shares outstanding. Adjusted EBITDA is expected to be in the range of $16 million to $17 million.

- **Full Year 2014 Guidance**: Total revenue is expected to be in the range of $466 million to $471 million. Adjusted net income per share is expected to be in the range of $0.44 to $0.48 based on approximately 99 million fully diluted weighted-average shares outstanding and a cash tax rate of 5%. Adjusted EBITDA is expected to be in the range of $52 million to $56 million. Free cash flow is expected to be in the range of $80 million to $84 million.

20.     On July 31, 2014 LifeLock filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Davis and Power and reaffirmed the Company's statements previously announced on July 30, 2014. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Davis and Power, who each certified:

1.     I have reviewed this Quarterly Report on Form 10-Q of LifeLock, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such

evaluation; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

21.    On October 30, 2014, the Company issued a press release entitled, "LifeLock Announces 2014 Third Quarter Results." Therein, the Company, in relevant part, stated:

> LifeLock, Inc. (NYSE: LOCK), an industry leader in identity theft protection, today announced financial results for the third quarter ended September 30, 2014.
>
> **Third Quarter 2014 Financial Highlights:**
>
> • **Revenue:** Total revenue was $123.0 million for the third quarter of 2014, up 29% from $95.7 million for the third quarter of 2013. Consumer revenue was $116.1 million for the third quarter of 2014, up 31% from $88.4 million for the third quarter of 2013. Enterprise revenue was $6.9 million for the third quarter of 2014, compared with $7.4 million for the third quarter of 2013.
>
> • **Net Income**: Net income was $5.7 million for the third quarter of 2014, compared with net income of $6.5 million for the third quarter of 2013. Net income per diluted share was $0.06 for the third quarter of 2014 based on 98.4 million weighted-average shares outstanding, compared with net income per diluted share of $0.07 for the third quarter of 2013 based on 96.4 million weighted-average shares outstanding.

• **Adjusted Net Income:** Adjusted net income was $15.9 million for the third quarter of 2014, compared with an adjusted net income of $11.6 million for the third quarter of 2013. Adjusted net income per diluted share was $0.16 for the third quarter of 2014 based on 98.4 million weighted-average shares outstanding, compared with an adjusted net income per diluted share of $0.12 for the third quarter of 2013 based on 96.4 million weighted-average shares outstanding.

• **Adjusted EBITDA:** Adjusted EBITDA was $17.9 million for the third quarter of 2014, compared with $12.8 million for the third quarter of 2013.

• **Cash Flow**: Cash flow from operations was $26.1 million for the third quarter of 2014, leading to free cash flow of $22.7 million after taking into consideration $3.5 million of capital expenditures. This compares with cash flow from operations of $18.2 million and free cash flow of $16.6 million, after taking into consideration $1.6 million of capital expenditures, for the third quarter of 2013.

• **Balance Sheet**: Total cash and marketable securities at the end of the third quarter of 2014 was $238.3 million, up from $216.0 million at the end of the second quarter of 2014.

"LifeLock produced another strong set of results combining both growth and profitability in the third quarter," said Todd Davis, LifeLock's Chairman and CEO. "The launch of our new product portfolio was well received, as we were pleased with the initial enrollment in the new offerings. We believe that consumers are increasingly realizing the superior value and functionality provided by our offerings compared with those from the providers of legacy credit monitoring solutions."

**Third Quarter 2014 & Recent Business Highlights:**

• Recorded the 38th consecutive quarter of sequential growth in revenue and cumulative ending members.

• Added approximately 264,000 gross new members in the third quarter of 2014 and ended the quarter with approximately 3.52 million members.

• Achieved a retention rate of 87.5% for the third quarter of 2014, compared with 87.6% for the third quarter of 2013.

• Increased monthly average revenue per member to $11.22 for the third quarter of 2014 from $10.48 for the third quarter of 2013.

• Announced a Beta version of LifeLock Privacy Monitor, a new offering designed to help consumers easily find their personal information online and take back control of this data in an effort to protect their identity.

• Supported the launch of the National PTA's campaign #ShareAwesome, a program designed to celebrate the positive use of digital and social media and to empower families to make smart, safe decisions when using the Internet and mobile devices.

• Launched a new business relationship with national residential mortgage lender PrimeLending, a PlainsCapital Company and subsidiary of Hilltop Holdings (NYSE: HTH).

**Guidance:**

As of October 29, 2014, we are initiating guidance for our fourth quarter of 2014 as well as updating our guidance for the full year 2014.

> • **Fourth Quarter 2014 Guidance**: Total revenue is expected to be in the range of $127 million to $129 million. Adjusted net income per diluted share is expected to be in the range of $0.26 to $0.27 based on approximately 100 million fully diluted weighted-average shares outstanding. Adjusted EBITDA is expected to be in the range of $29 million to $30 million.

> • **Full Year 2014 Guidance**: Total revenue is expected to be in the range of $473 million to $475 million. Adjusted net income per diluted share is expected to be in the range of $0.46 to $0.47 based on approximately 99 million fully diluted weighted-average shares outstanding and a cash tax rate of 5%. Adjusted EBITDA is expected to be in the range of $54 million to $55 million. Free cash flow is expected to be in the range of $82 million to $86 million.

22. On November 10, 2014, LifeLock filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Davis and Power, and reaffirmed the Company's statements previously announced on October 30, 2014. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Davis and Power, substantially similar to the certifications contained in ¶20, *supra.*

23. On February 10, 2015, the Company issued a press release entitled, "LifeLock Announces 2014 Fourth Quarter and Year-End Results." Therein, the Company, in relevant part, stated:

> LifeLock, Inc. (NYSE: LOCK), an industry leader in identity theft protection, today announced financial results for the fourth quarter and full year ended December 31, 2014.

> **Fourth Quarter 2014 Financial Highlights**:

> • **Revenue:** Total revenue was $129.7 million for the fourth quarter of 2014, up 27% from $102.3 million for the fourth quarter of 2013. Consumer revenue was $122.7 million for the fourth quarter of 2014, up 30% from $94.1 million for the fourth quarter of 2013. Enterprise revenue was $6.9 million for the fourth quarter of 2014,

compared with $8.2 million for the fourth quarter of 2013.

• **Net Income:** Net income was $2.8 million for the fourth quarter of 2014, compared with net income of $53.0 million for the fourth quarter of 2013. Net income per diluted share was $0.03 for the fourth quarter of 2014 based on 99.6 million weighted-average shares outstanding, compared with net income per diluted share of $0.54 for the fourth quarter of 2013 based on 98.0 million weighted-average shares outstanding. Net income for the fourth quarter of 2013 included an income tax benefit of $37.8 million, or $0.39 per diluted share, resulting primarily from the release of the valuation allowance associated with our deferred tax assets and net income for the fourth quarter of 2014 was negatively impacted by ($15.0) million, or ($0.15) per diluted share, for legal reserves and settlements during the quarter, which represent a $20.0 million legal reserve for a possible settlement with the Federal Trade Commission of their inquiry into our compliance with our 2010 FTC Consent Decree, which was partially offset by a $5.0 million legal settlement in our favor resulting from indemnification claims we previously made with respect to our Lemon acquisition.

• **Adjusted Net Income**: Adjusted net income was $27.7 million for the fourth quarter of 2014, compared with an adjusted net income of $21.5 million for the fourth quarter of 2013. Adjusted net income per diluted share was $0.28 for the fourth quarter of 2014 based on 99.6 million weighted-average shares outstanding, compared with an adjusted net income per diluted share of $0.22 for the fourth quarter of 2013 based on 98.0 million weighted-average shares outstanding.

• **Adjusted EBITDA**: Adjusted EBITDA was $30.2 million for the fourth quarter of 2014, compared with $22.9 million for the fourth quarter of 2013.

• **Cash Flow**: Cash flow from operations was $37.0 million for the fourth quarter of 2014, leading to free cash flow of $28.6 million after taking into consideration $3.4 million of capital expenditures and the $5.0 million received from the legal settlement resulting from indemnification claims we previously made with respect to our Lemon acquisition. This compares with cash flow from operations of $25.5 million and free cash flow of $20.4 million, after taking into consideration $5.2 million of capital expenditures, for the fourth quarter of 2013.

• **Balance Sheet:** Total cash and marketable securities at the end of the fourth quarter of 2014 was $273.9 million, up from $238.3 million at the end of the third quarter of 2014.

"We were pleased to report strong results on both the top and bottom line in the fourth quarter, capping another successful year for the company," said Todd Davis, LifeLock's Chairman and CEO. "We believe that our leading brand and most comprehensive protection positions us well to serve the needs of both consumers and enterprises in a world faced with the continual threat of identity theft."

**Fourth Quarter 2014 & Recent Business Highlights:**

• Recorded the 39th consecutive quarter of sequential growth in revenue and cumulative ending members.

• Added approximately 252,000 gross new members in the fourth quarter of 2014 and ended the quarter with approximately 3.63 million members.

• Achieved a retention rate of 87.7% for the fourth quarter of 2014, compared with 87.8% for the fourth quarter of 2013.

• Increased monthly average revenue per member to $11.43 for the fourth quarter of 2014 from $10.72 for the fourth quarter of 2013.

• Ranked 65th fastest growing company in the internet category of Deloitte's 2014 Technology Fast 500.

• Launched LifeLock Data Breach Service which enables enterprise organizations to rapidly activate LifeLock's proprietary identity alerts to protect their consumers or employees as a quick response to a data breach.

**Fiscal Year 2014 Financial Highlights:**

• **Revenue:** Total revenue was $476.0 million for 2014, up 29% from $369.7 million for 2013. Consumer revenue was $449.2 million for 2014, up 32% from $340.1 million for 2013. Enterprise revenue was $26.8 million for 2014, compared with $29.5 million for 2013.

• **Net Income**: Net income was $2.5 million for 2014, down from $54.5 million for 2013. Net income per diluted share was $0.03 for 2014 based on 99.1 million weighted-average shares outstanding, compared with net income per diluted share of $0.57 for 2013 based on 96.0 million weighted-average shares outstanding. Net income for 2013 included an income tax benefit of $37.5 million, or $0.39 per diluted share, resulting primarily from the release of the valuation allowance associated with our deferred tax assets and net income for 2014 was negatively impacted by ($15.0) million, or ($0.15) per diluted share, for legal reserves and settlements during the year, which represent a $20.0 million legal reserve for a possible settlement with the Federal Trade Commission of their inquiry into our compliance with our 2010 FTC Consent Decree, which was partially offset by a $5.0 million legal settlement in our favor resulting from indemnification claims we previously made with respect to our Lemon acquisition.

• **Adjusted Net Income:** Adjusted net income was $47.1 million for 2014, up from $36.9 million for 2013. Adjusted net income per diluted share was $0.48 for 2014 based on 99.1 million weighted-average shares outstanding, compared with $0.39 per diluted share for 2013 based on 96.0 million weighted-average shares outstanding.

• **Adjusted EBITDA:** Adjusted EBITDA was $55.5 million for 2014, up from $42.2 million for 2013.

• **Cash Flow:** Cash flow from operations was $109.2 million for 2014, leading to free cash flow of $89.6 million after taking into consideration $14.6 million of capital expenditures and the $5.0 million received from the legal settlement resulting from indemnification claims we previously made with respect to our Lemon acquisition. This compares with cash flow from operations of $77.4 million and free cash flow of $67.0 million, after taking into consideration $10.4 million of capital expenditures, for 2013.

**Guidance:**

As of February 10, 2015, we are initiating guidance for our first quarter of 2015 as well for the full year 2015.

• **First Quarter 2015 Guidance**: Total revenue is expected to be in the range of $133 million to $134 million. Adjusted net loss per share is expected to be in the range of ($0.07) to ($0.06) based on approximately 95 million basic weighted-average shares outstanding. Adjusted EBITDA is expected to be in the range of ($5) million to ($4) million.

• **Full Year 2015 Guidanc**e: Total revenue is expected to be in the range of $580 million to $588 million. Adjusted net income per diluted share is expected to be in the range of $0.63 to $0.67 based on approximately 103 million fully diluted weighted-average shares outstanding and a cash tax rate of 5%. Adjusted EBITDA is expected to be in the range of $76 million to $80 million. Free cash flow is expected to be in the range of $105 million to $110 million.

24.     On February 20, 2015, LifeLock filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.   The Company's Form 10-K was signed by Defendants Davis and Power, and reaffirmed the Company's statements previously announced on February 10, 2015. The Form 10-K also contained required Sarbanes-Oxley certifications, signed by Defendants Davis and Power, substantially similar to the certifications contained in ¶20, *supra*.

25.     On April 29, 2015, LifeLock issued a press release entitled, "LifeLock Reports First Quarter 2015 Financial Results."   Therein, the Company, in relevant part, stated:

LifeLock, Inc. (NYSE: LOCK), an industry leader in identity theft protection, today announced financial results for the first quarter ended March 31, 2015.

**First Quarter 2015 Financial Highlights:**

• **Revenue**: Total revenue was $134.4 million for the first quarter of 2015, up 25% from $107.6 million for the first quarter of 2014. Consumer revenue was $128.2 million for the first quarter of 2015, up 27% from $101.0 million for the first quarter of 2014. Enterprise revenue was $6.2 million for the first quarter of 2015, compared with $6.6 million for the first quarter of 2014.

 **Net loss**: Net loss was $9.2 million for the first quarter of 2015, compared with a net loss of $4.3 million for the first quarter of 2014. Net loss per diluted share was $0.10 for the first quarter of 2015 based on 94.0 million weighted-average shares outstanding, compared with a net loss per diluted share of $0.05 for the first quarter of 2014 based on 91.9 million weighted-average shares outstanding.

• **Adjusted Net Loss**: Adjusted net loss was $5.2 million for the first quarter of 2015, compared with an adjusted net loss of $1.0 million for the first quarter of 2014. Adjusted net loss per diluted share was $0.06 for the first quarter of 2015 based on 94.0 million weighted-average shares outstanding, compared with an adjusted net loss per diluted share of $0.01 for the first quarter of 2014 based on 91.9 million weighted-average shares outstanding.

• **Adjusted EBITDA**: Adjusted EBITDA was $(3.0) million for the first quarter of 2015, compared with $0.7 million for the first quarter of 2014.

• **Cash Flow**: Cash flow from operations was $20.5 million for the first quarter of 2015, leading to free cash flow of $17.7 million after taking into consideration $2.8 million of capital expenditures. This compares with cash flow from operations of $18.3 million and free cash flow of $14.4 million, after taking into consideration $3.9 million of capital expenditures, for the first quarter of 2014.

• **Balance Sheet**: Total cash and marketable securities at the end of the first quarter of 2015 was $293.4 million, up from $273.9 million at the end of the fourth quarter of 2014.

"Against a backdrop of continued data breaches, we produced the best quarter of gross new member additions in the history of the company." said Todd Davis, LifeLock's Chairman and CEO. "We believe this performance is indicative of the power of our brand and the growing recognition of the differentiated nature of our offerings."

**First Quarter 2015 & Recent Business Highlights:**

• Recorded the 40th consecutive quarter of sequential growth in revenue and cumulative ending members.

• Added approximately 421,000 gross new members in the first quarter of 2015 and ended the quarter with approximately 3.89 million members.

• Achieved a retention rate of 87.8% for the first quarter of 2015, compared with 87.5% for the first quarter of 2014.

• Increased monthly average revenue per member to $11.38 for the first quarter of 2015 from $10.81 for the first quarter of 2014.

• Announced a partnership with Sam's Club, a division of Wal-Mart Stores, to offer LifeLock services to Sam's Club members on-line and in a pilot store program.

• Welcomed two new executives to LifeLock by adding Ignacio Martinez as Chief Risk Officer and Peter Levinson as SVP of Product & Technology.

**Guidance:**

As of April 29, 2015, we are initiating guidance for our second quarter of 2015 as well for the full year 2015.

• **Second Quarter 2015 Guidance**: Total revenue is expected to be in the range of $143 million to $144 million. Adjusted net income per share is expected to be in the range of $0.08 to $0.09 based on approximately 100 million fully diluted weighted-average shares outstanding. Adjusted EBITDA is expected to be in the range of $11 million to $12 million.

• **Full Year 2015 Guidance**: Total revenue is expected to be in the range of $584 million to $590 million. Adjusted net income per diluted share is expected to be in the range of $0.64 to $0.67 based on approximately 102 million fully diluted weighted-average shares outstanding and a cash tax rate of 5%. Adjusted EBITDA is expected to be in the range of $77 million to $80 million. Free cash flow is expected to be in the range of $107 million to $112 million.

26. On April 30, 2015, LifeLock filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Davis and Power, and reaffirmed the Company's statements previously announced on April 29, 2015. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Davis and Power, substantially similar to the certifications contained in ¶20, *supra*.

27. The statements contained in ¶¶19-26 were materially false and/or misleading regarding the Company's services and compliance with the FTC settlement when made because defendants failed to disclose or indicate the following: (1) that the Company had failed to establish and maintain a comprehensive information security program to protect its users' sensitive personal data, including credit card, social

security, and bank account numbers; (2) that the Company falsely advertised that it protected consumers' sensitive data with the same high-level safeguards as financial institutions; (3) that the Company failed to meet the 2010 Settlement's recordkeeping requirements; and, (4) that, as a result of the foregoing, the Company's statements about its business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

28.     On July 21, 2015, the FTC issued a press release entitled, "FTC Takes Action Against LifeLock for Alleged Violations of 2010 Order." Therein, the FTC, in relevant part, stated:

> The Federal Trade Commission today asserted that LifeLock violated a 2010 settlement with the agency and 35 state attorneys general by continuing to make deceptive claims about its identity theft protection services, and by failing to take steps required to protect its users' data.

> In documents filed with the U.S. District Court for the District of Arizona, the FTC charged that LifeLock failed to live up to its obligations under the 2010 settlement, and asked the court to impose an order requiring LifeLock to provide full redress to all consumers affected by the company's order violations.

> "It is essential that companies live up to their obligations under orders obtained by the FTC," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "If a company continues with practices that violate orders and harm consumers, we will act."
> The 2010 settlement stemmed from previous FTC allegations that LifeLock used false claims to promote its identity theft protection services. The settlement barred the company and its principals from making any further deceptive claims; required LifeLock to take more stringent measures to safeguard the personal information it collects from customers; and required LifeLock to pay $12 million for consumer refunds.

> The FTC charged today that in spite of these promises, from at least October 2012 through March 2014, LifeLock violated the 2010 Order by: 1) failing to establish and maintain a comprehensive information security program to protect its users' sensitive personal data, including credit card, social security, and bank account numbers; 2) falsely advertising that it protected consumers' sensitive data with the same high-level safeguards as financial institutions; and 3) failing to meet the 2010 order's recordkeeping requirements.

> The FTC also asserts that from at least January 2012 through December 2014, LifeLock falsely claimed it protected consumers' identity 24/7/365

16

by providing alerts "as soon as" it received any indication there was a problem.

Details of the FTC's action against the company were filed under seal. The court will determine which portions of the case will be unsealed.

The Commission vote to file the application for a show cause order was 4-1, with Commissioner Maureen K. Ohlhausen voting no.

29. On this news, shares of LifeLock declined $7.91 per share, nearly 50%, to close on July 21, 2014, at $8.15 per share, on unusually heavy volume.

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired LifeLock's securities between July 30, 2014 and July 20, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LifeLock's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of LifeLock shares were traded publicly during the Class Period on the NYSE. As of July 20, 2015, LifeLock had 94,370,253 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by LifeLock or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of LifeLock; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.     The market for LifeLock's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, LifeLock's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LifeLock's securities relying upon the integrity of the market price of the Company's securities and market information relating to LifeLock, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing

public, thereby inflating the price of LifeLock's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about LifeLock's business, operations, and prospects as alleged herein.

36. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LifeLock's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

37. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38. During the Class Period, Plaintiff and the Class purchased LifeLock's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39. As alleged herein, Defendants acted with scienter in that Defendants

knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding LifeLock, his/her control over, and/or receipt and/or modification of LifeLock's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LifeLock, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

40. The market for LifeLock's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, LifeLock's securities traded at artificially inflated prices during the Class Period. On December 30, 2014, the Company's stock closed at a Class Period high of $18.23 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of LifeLock's securities and market information relating to LifeLock, and have been damaged thereby.

41. During the Class Period, the artificial inflation of LifeLock's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LifeLock's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of LifeLock and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated

at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42. At all relevant times, the market for LifeLock's securities was an efficient market for the following reasons, among others:

(a) LifeLock stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, LifeLock filed periodic public reports with the SEC and/or the NYSE;

(c) LifeLock regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) LifeLock was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43. As a result of the foregoing, the market for LifeLock's securities promptly digested current information regarding LifeLock from all publicly available sources and reflected such information in LifeLock's stock price. Under these circumstances, all purchasers of LifeLock's securities during the Class Period suffered similar injury through their purchase of LifeLock's securities at artificially inflated prices and a presumption of reliance applies.

### **NO SAFE HARBOR**

44. The statutory safe harbor provided for forward-looking statements under

21

certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of LifeLock who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

45.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase LifeLock's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course

of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LifeLock's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LifeLock's financial well-being and prospects, as specified herein.

49. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LifeLock's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LifeLock and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

50. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other

defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

51. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LifeLock's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LifeLock's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired LifeLock's securities during the Class Period at artificially high prices and were damaged thereby.

53. At the time of said misrepresentations and/or omissions, Plaintiff and

other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that LifeLock was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LifeLock securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

56. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57. The Individual Defendants acted as controlling persons of LifeLock within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

58. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59. As set forth above, LifeLock and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 22, 2015.

**TIFFANY & BOSCO, P.A.**


By:   */s/ Richard G. Himelrick*
      Richard G. Himelrick
      Seventh Floor Camelback Esplanade II
      2525 East Camelback Road
      Phoenix, AZ 85016

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

 */s/ Shelley Boettge*
Shelley Boettge