SACKS, RICKETTS & CASE LLP
Cynthia A. Ricketts, SBN 012668
cricketts@srclaw.com
2800 North Central Avenue, Suite 1230
Phoenix, AZ 85004
Telephone: (602) 385-3370
Facsimile: (602) 385-3371

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Boris Feldman (*Pro Hac Vice*)
boris.feldman@wsgr.com
Elizabeth C. Peterson (*Pro Hac Vice*)
epeterson@wsgr.com
Gideon A. Schor (*Pro Hac Vice*)
gschor@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Defendants
LifeLock, Inc., Todd Davis,
Chris G. Power, and Hilary A. Schneider

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Miguel Avila, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LifeLock, Inc., Todd Davis, Chris G. Power, and Hilary A. Schneider<br><br>Defendants. | Case No.: 2:15-cv-01398-SRB<br><br>CLASS ACTION<br><br>Hon. Susan R. Bolton<br><br>**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................3

I.  PLAINTIFFS' UNAMENDED ALLEGATIONS FAIL FOR THE REASONS
    STATED IN DEFENDANTS' FIRST MOTION TO DISMISS................................3

II. PLAINTIFFS' AMENDED ALLEGATIONS—*I.E.*, THE NEW
    ALLEGATIONS OF THE SECOND AMENDED COMPLAINT—FAIL TO
    CORRECT THE FLAWS NOTED IN THIS COURT'S *AVILA I* ORDER..............5

    A.  The New Allegations Concerning "Near Real-Time" Alerts Fail to
        Allege a False Statement or to Raise a Strong Inference of Scienter ...........5

        1.  No False Statement ...........................................................................5

            a.  The Two Newly Alleged Statements Add Nothing of
                Substance to the Allegations of the Prior Complaint..............5

                i.   Defendant Davis' New Statement ...............................5

                ii.  Defendant Schneider's New Statement .......................6

            b.  The New Allegations of the Second Amended
                Complaint Fail to Establish That Any Alleged Statement
                Was False.................................................................................7

        2.  No Scienter ......................................................................................13

    B.  There Are No New Allegations That Defendant Misrepresented the
        "Severity" of the FTC Investigation...........................................................16

        1.  No New Alleged Statements or Falsity Allegations........................16

        2.  No New Scienter Allegations ..........................................................17

    C.  The New Allegations Concerning Data Security and PCI Compliance
        Fail to Allege a False Statement or to Raise a Strong Inference of
        Scienter .......................................................................................................17

        1.  No False Statement .........................................................................17

        2.  No Scienter ......................................................................................18

III. THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A § 20(a)
     CLAIM..................................................................................................................18

CONCLUSION ..............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ........................................................................ 14

*Azadpour v. Sun Microsystems, Inc.*, No. C06-03272 MJJ, 2007 U.S. Dist. LEXIS 55502 (N.D. Cal. July 22, 2007) ................................................. 8, 11, 14

*Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ...................................................................................................... 15

*Browning v. Amyris, Inc.*, No. 13-cv-02209-WHO, 2014 U.S. Dist. LEXIS 39549 (N.D. Cal. Mar. 24, 2014) ..................................................................... 15

*Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199 (C.D. Cal. 2012), *aff'd*, 2016 U.S. App. LEXIS 11345 (9th Cir. June 22, 2016) ......................................................................................................... 8

*Karpov v. Insight Enters., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 4867634 (D. Ariz. Nov. 16, 2010), *aff'd*, 471 F. App'x 607 (9th Cir. 2012) ........................................................................................................... 18

*Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 U.S. Dist. LEXIS 100319 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 F. App'x 570 (9th Cir. 2010) ........................................................................................................... 8

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002) ........................................ 18

*McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2009 U.S. Dist. LEXIS 59996 (N.D. Cal. July 14, 2009) ...................................................................... 8

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ...................... 8, 10, 14

*Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) ................................. 13

*Zucco Partners, LLC, v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ............ 10, 13, 14, 15, 16, 17

## STATUTES

15 U.S.C. § 78u-4(b)(1)(B) ....................................................................................... 5, 7

Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4(a) *et seq.* ............................................................................................................. 1, 11

Securities Exchange Act of 1934

§ 10(b) ................................................................................................................ 18

§ 20(a) ................................................................................................................ 18

1

**RULES**

Federal Rule of Civil Procedure 8 ................................................................. 1

Federal Rule of Civil Procedure 9(b) ...................................................... 1, 11

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 1

Federal Rule of Civil Procedure 60(b) ........................................................... 4

Defendants[1] hereby move to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4(a) *et seq.* (the "Reform Act"). Because Plaintiffs' few new allegations woefully fail to correct the flaws noted in this Court's order dismissing the Prior Complaint on August 3, 2016 ("*Avila I* Order"), this action should be dismissed in its entirety with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Second Amended Complaint changes so little of the Prior Complaint that Plaintiffs have proved Ecclesiastes' dictum, "There is nothing new under the sun." Long stretches of the Second Amended Complaint are taken verbatim from the now-dismissed Prior Complaint. The few new allegations—most of which are cosmetic alterations that do not change the substance of the Prior Complaint—fail to correct the flaws noted in this Court's *Avila I* Order.

The addition of two new confidential witnesses ("CWs") and of new allegations from an existing CW changes nothing, as the new CW allegations suffer from the same

---

[1] Defendants Todd Davis, Chris G. Power, and Hilary A. Schneider are collectively referred to herein as the "Individual Defendants," and, collectively with defendant LifeLock, Inc. ("LifeLock" or the "Company"), as "Defendants." Lead Plaintiffs Oklahoma Police Pension and Retirement System and Oklahoma Firefighters Pension and Retirement System are referred to herein as "Plaintiffs." Plaintiffs' Second Amended Complaint is referred to herein as the "Second Amended Complaint" or the "SAC." Plaintiffs' Amended Complaint is referred to herein as the "Prior Complaint" or the "AC." For the Court's convenience, the Declaration of Gideon A. Schor dated December 16, 2016, submitted herewith ("Schor Decl."), attaches as exhibits the following documents cited in this memorandum: (i) Plaintiffs' redline of the Second Amended Complaint (showing changes from the Prior Complaint) filed herein on September 23, 2016 ("SAC redline"), *see* Schor Decl. Ex. 1; (ii) Defendants' memorandum of law in support of their motion to dismiss the Prior Complaint herein ("Def. Mem."), *see* Schor Decl. Ex. 2; (iii) Defendants' reply memorandum in support of their motion to dismiss the Prior Complaint herein ("Reply"), *see* Schor Decl. Ex. 3; (iv) the Order dismissing the Second Amended Complaint in the *Bien* litigation, *In re LifeLock, Inc. Sec. Litig.*, No. CV-14-00416-PHX-SRB (D. Ariz.) ("*Bien II* Order"), *see* Schor Decl. Ex. 4; and (v) the *Avila I* Order, *see* Schor Decl. Ex. 5. These exhibits may all be judicially noticed as demonstrated in the Request for Judicial Notice submitted herewith.

1    fatal flaws as those of the original CWs.  The handful of other new allegations—whether

2    they concern near-real time alerts, PCI security standards, or the FTC investigation—do

3    not otherwise allege a false statement or raise a strong inference of scienter.

4         In particular, the allegations by CW5 fail because they concern events *pre-dating*

5    the Class Period.  In the Second Amended Complaint, Plaintiffs newly challenge

6    Defendant Davis' alleged remark that LifeLock's "Ultimate Plus" service is the "most

7    comprehensive identity protection product in the market today."  SAC ¶ 89.  Although

8    the Second Amended Complaint  calls the statement false, no factual allegations actually

9    establish falsity.  The Second Amended Complaint charges that the statement is false

10   because, assertedly, "there was a 70% likelihood that customers enrolled in the

11   Company's *Ultimate Plus* package would receive stale credit check alerts at least a week

12   late . . . ."  SAC ¶ 118 (emphasis added).  But Plaintiffs' attempt to allege a particularized

13   basis for the charge—a statement by CW5—fails:  the *only* customers that CW5 alleges

14   to have been affected by this staleness issue were "Ultimate" customers, *not* "Ultimate

15   Plus" customers.  SAC ¶ 120.  "Ultimate" service, in turn, ended *before* the Class Period

16   began, as the Second Amended Complaint expressly acknowledges.  SAC ¶ 42 n.3.

17   Thus, this allegation by CW5 indisputably concerns a *pre-Class Period* matter.

18        The other new CW allegations are similarly defective.  The new allegations by

19   CW4 likewise concern events pre-dating the Class Period.  And the allegations by CW6

20   do not even mention an Individual Defendant.

21        This is now the *fourth* motion to dismiss made by LifeLock in response to

22   shareholder claims concerning the *same* events and statements.  But the present pleading

23   fares no better than the prior three.  The vice infecting all four pleadings is the erroneous

24   assumption that an alleged violation of consumer protection law—such as arises when a

25   company does not deliver a product as advertised—equals a violation of securities law.

26   Consumer law is not the same as investor law:  whether a company has delivered its

27   product as advertised says nothing about whether the company's statements to investors

28   were misleading.  In this fourth, and hopefully final, pleading, Plaintiffs still fail to

1    demonstrate that LifeLock's product descriptions (*e.g.*, in SEC filings) were rendered

2    false by LifeLock's service disruptions, especially where LifeLock expressly made

3    negative disclosures about service disruptions and further made any necessary redress in

4    its settlement with the FTC and consumer plaintiffs in October 2015.  Defendants

5    respectfully seek a final end to all such securities litigation so that LifeLock can resume

6    giving undivided attention to protecting consumers from identity theft.

7         Accordingly, the Second Amended Complaint should be dismissed.  Because

8    further amendment cannot cure the fatal defects in Plaintiffs' pleading, the dismissal

9    should be with prejudice.

10    <u>**ARGUMENT**</u>

11
12    I.    **PLAINTIFFS' UNAMENDED ALLEGATIONS FAIL FOR THE REASONS STATED IN DEFENDANTS' FIRST MOTION TO DISMISS**

13         Long portions of the Prior Complaint have been inserted—without meaningful

14    omission—into the Second Amended Complaint.[2]  Such portions should accordingly be

15    dismissed pursuant to the arguments set forth in Defendants' motion to dismiss the Prior

16    Complaint; those arguments are incorporated by reference herein.  Specifically, those

17    arguments are:

18    • the alert-related statements were not alleged to be false or misleading:  (a)
19      Plaintiffs' theory of falsity proves too much, because product descriptions in a
       company's SEC filings cannot be rendered false merely by an imperfect record
20      of product delivery, and because ultimately Plaintiffs claim only corporate
       mismanagement and nondisclosure thereof, (b) Plaintiffs fail to allege facts
       required by the *Bien* holdings, including both the extent of alleged service
21      outages and the deception that would render corporate mismanagement violative
       of securities law, (c) the contempt action and settlement do not establish falsity,
22      and (d) neither the Granite Report allegations nor the throttling allegations
       allege that the alert-related statements were false or misleading  (Def. Mem. at
23      16-20; Reply at 3-6);

24    • Defendants did not misrepresent the "severity" of the FTC investigation:  (a) the
       term "inquiry" was not misleading, (b) the investigation's seriousness was
25      timely disclosed, (c) the term "compliance" was not misleading, (d) the terms

26    ───────────────

27    [2] *See* SAC redline (showing extensive commonality between Prior Complaint and Second Amended Complaint).

28

"dialogue" and "industry-wide" were not misleading, (e) Defendants' disclosures rendered the "formal"/"informal" distinction irrelevant, and (f) the "*Bien III* Order," which denied the *Bien* plaintiffs' Rule 60(b) motion, disposes of this claim (Def. Mem. at 20-25; Reply at 6-9);

- the statements concerning data security and PCI compliance were not alleged to be false or misleading:  (a) the allegation concerning the level of protection does not allege falsity, (b) Defendant Davis' question quoted by Plaintiffs was not a false statement, (c) LifeLock's web advertising creates no liability, and (d) the CWs and whistleblowers do not establish falsity (Def. Mem. at 25-28);

- Plaintiffs fail to show that anything beyond mismanagement was alleged in the Prior Complaint (Def. Mem. at 16-20; Reply at 11-12);

- the negative disclosures negate any inference of scienter (Def. Mem. at 28-30; Reply at 14-16);

- a strong inference of scienter is not raised as to the Prior Complaint's allegations of CW1, CW2, CW3, Burke, and Peters, or the unamended portion of the Prior Complaint's allegations of CW4 (Def. Mem. at 30-33; Reply at 12-14);

- nothing in the declaration submitted in the *Ebarle* action (the "*Ebarle* declaration") renders any statement false or misleading or raises a strong inference of scienter (Reply at 2, 13);[3]

- no allegation by Plaintiffs' consultant renders any statement false or misleading or raises a strong inference of scienter (Def. Mem. at 33; Reply at 14);

- a strong inference of scienter is not raised as to LifeLock (Def. Mem. at 33);

- the core operations inference is inapplicable (Def. Mem. at 33-34; Reply at 14); and

---

[3] The Prior Complaint did not mention, or include any allegations from, the *Ebarle* declaration.  *See Avila I* Order at 5 n.3.  Rather, the *Ebarle* declaration was submitted along with Plaintiffs' opposition to Defendants' motion to dismiss the Prior Complaint, *see id.*; Reply at 2 n.2, and that opposition made arguments based on the *Ebarle* declaration (*see* Opposition at 25).  In response, Defendants' Reply (which referred to the *Ebarle* declaration as the "Bates-Sobol Declaration") argued not only that the *Ebarle* declaration was outside the pleadings and should be ignored (Reply at 2 & n.2) but also that the content of the *Ebarle* declaration failed to render any statement false or misleading or to raise a strong inference of scienter (*id.* at 2, 13).  The Court's *Avila I* Order held that the *Ebarle* declaration was outside the pleadings and would not be considered, *see Avila I* Order at 5 n.3; the *Avila I* Order did not reach Defendants' arguments concerning the content of the *Ebarle* declaration.  Now that the Second Amended Complaint has alleged a small portion of the content of the *Ebarle* declaration (SAC p. 1, ¶¶ 7, 8, 149), Defendants hereby incorporate by reference the content-related arguments that were made in the motion to dismiss the Prior Complaint and that were not addressed by the *Avila I* Order. *See* Reply at 2, 13.  Other fatal flaws in the Second Amended Complaint's allegations based on the *Ebarle* declaration are discussed *infra* at Point II.C.1.

- the allegations as a whole fail to raise a strong inference of scienter because the non-fraudulent explanation for Defendants' conduct is more compelling (Def. Mem. at 34-35).

Finally, two additional sections of the memorandum supporting Defendants' motion to dismiss the Prior Complaint are incorporated by reference herein:  the statement of facts;[4] and the discussion of the legal standards applicable to this Reform Act case.[5]

## II.   PLAINTIFFS' AMENDED ALLEGATIONS—*I.E.*, THE NEW ALLEGATIONS OF THE SECOND AMENDED COMPLAINT—FAIL TO CORRECT THE FLAWS NOTED IN THIS COURT'S *AVILA I* ORDER

### A.   The New Allegations Concerning "Near Real-Time" Alerts Fail to Allege a False Statement or to Raise a Strong Inference of Scienter

#### 1.   No False Statement

##### a.   The Two Newly Alleged Statements Add Nothing of Substance to the Allegations of the Prior Complaint

To comply with the obligation to "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1)(B), the Second Amended Complaint alleges only two new statements—Defendant Davis' statement in SAC ¶ 89 and Defendant Schneider's statement in SAC ¶ 105.  Neither statement adds anything of substance to the Prior Complaint's allegations.

###### i.   Defendant Davis' New Statement

The Second Amended Complaint newly alleges Mr. Davis' statement that "Ultimate Plus" is the "most comprehensive identity protection product in the market today."  SAC ¶ 89.  We refer to this as the "Davis statement."

But the Prior Complaint already alleged statements in which Mr. Davis describes LifeLock's products with similar superlatives:  "Davis later stated, at the same conference, that LifeLock aggregates data about consumer transactions not to sell them to others, but only 'to give *the most accurate, visible, realtime response back when it comes*

---

[4] Def. Mem. at 4-12.

[5] *Id.* at Point I.

*to fraud.*'" AC ¶ 89 (emphasis added).[6]  The Prior Complaint alleged an additional similar statement by Mr. Davis:  "Now we don't see every transaction in real time, but we're going to have *the broadest coverage . . . .*"  AC ¶ 96 (emphasis added).[7]

Just as this previously alleged use of superlatives to describe LifeLock's products was insufficient to avoid dismissal of the Prior Complaint, so too it is insufficient to avoid dismissal of the Second Amended Complaint:  the Davis statement adds nothing of substance to the Prior Complaint's allegations.  In any event, Defendants' specific arguments as to why the Davis statement is not alleged to be false are set forth *infra* at Point II.A.1.b.

### ii.    Defendant Schneider's New Statement

The Second Amended Complaint newly alleges the following statement of Ms. Schneider, which is an expansion of a statement already alleged in the Prior Complaint (AC ¶ 99):  "I did the same thing with my son who needed something besides jeans.  My son said, wow, that really works.  On the alerting side, consumers really value just knowing that it doesn't take—all you have to do is say, yes or no.  It is low friction but high value to the consumer."  SAC ¶ 105.  We refer to this as the "Schneider statement."

According to the Schneider statement, customers value the alerts and the simplicity of being able to say no to an alert, and Ms. Schneider's son remarked to Ms. Schneider that the alerts work.  But this adds nothing to the allegations of the Prior Complaint.

The Prior Complaint already alleged that consumers (of whom Ms. Schneider's son is apparently one) believe the alerts work and value the alerts and the simplicity of being able to say no in response to an alert.  Thus, the Prior Complaint alleged that Ms. Schneider said:  "[T]hese alerts are very valuable to our members.  We know that.  If we ask you, we just detected, I'm in a Banana Republic buying something, I open a credit

---

[6] This same statement is realleged in SAC ¶ 94.

[7] This same statement is realleged in SAC ¶ 101.

card, I'm standing there and I get that alert that says, your PII was just detected in a transaction.  Is that you?  Even if it is me and I say, yes, our users love it because they know it's working."  AC ¶ 99.[8]  Similarly, according to the Prior Complaint, Mr. Davis said that "[w]ith one button push, you can say no, not me," upon receiving an alert.  AC ¶ 92.[9]  The Prior Complaint further alleged that Mr. Davis stated:  "[Upon receiving an alert,] customers have 'a chance to say, no, not me'" (AC ¶ 99[10])—a statement that, according to the Prior Complaint, Schneider reiterated (AC ¶ 99).  Notably, the Second Amended Complaint does not allege that Schneider's son never actually said, "wow, that really works."

Because these previously alleged statements were insufficient to avoid dismissal of the Prior Complaint, the Schneider statement is insufficient to avoid dismissal of the Second Amended Complaint:  the Schneider statement adds nothing of substance to the Prior Complaint's allegations.

### b.   The New Allegations of the Second Amended Complaint Fail to Establish That Any Alleged Statement Was False

With respect to the Davis statement (SAC ¶ 89), the Second Amended Complaint fails to satisfy the Reform Act's requirements to "specify . . . the reason or reasons" why the statement is false and to "state with particularity all facts" supporting Plaintiffs' belief that the statement is false.  *See* 15 U.S.C. § 78u-4(b)(1)(B).[11]

---

[8] This same statement is realleged in SAC ¶ 105.

[9] This same statement is realleged in SAC ¶ 97.

[10] This same statement is realleged in SAC ¶ 104.

[11] All of the SAC's allegations—besides those concerning the Lead Plaintiffs themselves—are made on information and belief.  *See* SAC p. 1.  Thus, insofar as Plaintiffs allege (i) that the Davis statement (SAC ¶ 89) is false and (ii) the reason why Plaintiffs believe it to be false, Plaintiffs must plead with particularity the facts supporting their belief that the statement is false.  *See* 15 U.S.C. § 78u-4(b)(1)(B) (plaintiff must, "if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.").

**The SAC actually demonstrates the *veracity* of the Davis statement:**  SAC ¶ 113 alleges evidence—specifically, an analyst's report—demonstrating that LifeLock's product *is* more comprehensive than competitor products:  "LifeLock offers *the most comprehensive consumer identity protection in the industry*.  We believe its strong brand recognition, patented and *industry-leading* technology, and *premium services differentiate it among peers.*"  *See* SAC ¶ 113 (emphasis added).  This allegation dooms any effort by Plaintiffs to allege that the Davis statement was false.  Even if another allegation of the Second Amended Complaint were to identify competitor products that are allegedly more comprehensive than LifeLock's product, that allegation would be contradicted by SAC ¶ 113.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (dismissing complaint where allegations internally inconsistent); *Azadpour v. Sun Microsystems, Inc.*, No. C06-03272 MJJ, 2007 U.S. Dist. LEXIS 55502, at *5 (N.D. Cal. July 22, 2007) (same).[12]

**The SAC fails to satisfy the particularity requirement:**  In any event, the Second Amended Complaint also fails to state with particularity the facts supporting

---

[12] *See also Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012) ("Plaintiffs' allegation that Deloitte unquestioningly acquiesced to FRB and the Bank's alleged wrongdoing is further undermined by the fact that Deloitte identified a material weakness in FRB's internal controls in its 2007 opinion.  Deloitte's opinion, issued March 17, 2008 as part of FRB's publicly filed 10-K, states:  'In our opinion, because of the effect of the material weakness . . . the Company has not maintained effective internal control over financial reporting as of and for the year ended December 31, 2007.'  2007 Form 10-K at 52.  This opinion is inconsistent with Plaintiffs' allegation that Deloitte pandered to FRB's management.  It instead bolsters an inference of nonfraudulent intent."), *aff'd*, 2016 U.S. App. LEXIS 11345 (9th Cir. June 22, 2016); *McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2009 U.S. Dist. LEXIS 59996, at *22 (N.D. Cal. July 14, 2009) ("[P]laintiff's fraud theory depends on defendants' deliberate understatement of the costs of revenue and overstatement of gross margins.  However, during two quarters during the class period (1Q07 and 2Q07) FormFactor overstated—not understated—the cost of revenues, thus understating—not overstating—its gross margins.  These facts are inconsistent with plaintiffs' theory of fraud."); *Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 U.S. Dist. LEXIS 100319, at *17 (N.D. Cal. Dec. 9, 2008) ("In addition, as Defendants point out, an overstatement of the value of 'in-the-money' options would mean that Rambus's compensation expenses for 2004 and 2005 would have been overstated.  Logically, such overstatement would mean that the price of Rambus stock purchased by Plaintiffs was deflated rather than inflated."), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).

1   Plaintiffs' belief that the Davis statement is false.  The Second Amended Complaint

2   labels the statement false (SAC ¶ 118), but the allegations made by the Second Amended

3   Complaint to establish falsity (SAC ¶¶ 118, 120)—all artfully worded—do not in fact

4   establish falsity.

5        The Second Amended Complaint first charges, in paragraph 118, that the Davis

6   statement is false because, assertedly, "there was a 70% likelihood that customers

7   enrolled in the Company's *Ultimate Plus* package would receive stale credit check alerts

8   at least a week late . . . ."  SAC ¶ 118 (emphasis added).[13]  But the purportedly

9   particularized basis for the charge—CW5's statement in SAC ¶ 120[14]—does not in fact

10  support the charge.  Fatally for Plaintiffs, CW5's statement in SAC ¶ 120 neither alleges

11  any event during the Class Period nor even concerns the "Ultimate Plus" package.[15]

12       CW5 makes two basic allegations in SAC ¶ 120, and each is flawed.

13       First, CW5 alleges that 70% of "credit check alerts" were stale.  SAC ¶ 120.  But

14  the allegation never states that the alleged 70% staleness rate occurred *during the Class*

15

---

16  [13] A similar charge appears in the introduction to the Second Amended Complaint.  *See*
    SAC ¶ 9.

17  [14] In the relevant allegation, set forth in SAC ¶ 120, CW5 alleges as follows:

18      CW 5 stated that 70% of the credit check alerts were stale and that a stale
        alert meant that an alert was at least one week old.  According to CW 5, the

19      70% chance of a week or longer delay applied to—the situation Defendant
        Davis described in his false and misleading statements—where a customer

20      receives an alert while waiting in line at a Verizon store to buy a phone and
        having their credit check run in order to get that phone. *CW 5 stated that a*

21      *"huge chunk" of LifeLock's "Ultimate" customers were affected by the stale*
        *credit check alerts.* CW 5 added that credit check alerts were the most

22      common alerts as a result of there being three credit rating agencies.
        According to CW 5, credit check alerts were also the most important because

23      "that's what people were paying for" by choosing the most comprehensive
        subscription and that there was "no value" in the credit check alerts given

24      that there was a 70% likelihood of the alert being stale.

25  SAC ¶ 120 (emphasis added).

26  [15] CW5's other allegations (a) concern scienter rather than falsity (*see* SAC ¶¶ 121, 122,
    130, 196, 198) or (b) add nothing of substance because they simply allege service outages

27  without alleging their extent as required (*see* SAC ¶ 129; *Bien II* Order at 7, 17; *infra* at
    note 18).

28

1   *Period. See* SAC ¶ 120.  Moreover, CW5 began working at LifeLock in 2007 (SAC ¶

2   82), and the Second Amended Complaint never alleges that "credit check alerts" were

3   unique to the Class Period.  For all that appears, the allegation of a 70% staleness rate

4   concerns service *before* the Class Period.  Thus, this CW5 allegation fails the basic

5   requirement that, to have any legal consequence, an event alleged by a CW must be

6   alleged to have occurred *during the Class Period.*[16]  *Avila I* Order at 8 (citing *Zucco*

7   *Partners, LLC, v. Digimarc Corp.*, 552 F.3d 981, 997 (9th Cir. 2009)).  An event *pre-*

8   *dating* the Class Period cannot belie a statement made *during and about* the Class Period.

9          Second, the *only* statement by CW5 that is even arguably tied to a particular time

10   period is CW5's statement that the staleness of credit check alerts impacted "Ultimate"

11   customers (not "Ultimate Plus" customers, as charged in SAC ¶ 118).  SAC ¶ 120.  But

12   the statement is tied to the *wrong* time period:  "Ultimate" service ended *before* the Class

13   Period began.  Indeed, the Second Amended Complaint explicitly alleges that, at the start

14   of the Class Period, "Ultimate" service was *replaced* by "Ultimate Plus" service:  "At the

15   beginning of the Class Period, LifeLock introduced a new suite of identity theft services

16   with differing levels of protection and price points known as 'Standard,' 'Advantage' and

17   '*Ultimate Plus*.'  These services *replaced* the old three-level system under which the

18   levels were known as 'LifeLock,' 'LifeLock Command Center' and '*Ultimate*.'"  SAC ¶

19   42 n.3 (emphasis added).  Thus, this allegation by CW5 indisputably concerns a *pre-*

20   *Class Period* matter, namely, "Ultimate" service.

21          In sum, the charge of a 70% staleness rate in SAC ¶ 118 is rendered both

22   irrelevant and false by the very CW5 allegations on which the charge purports to rely (*see*

23   SAC ¶ 120).  Where the plaintiff pleads specific facts that belie or undermine the

24   plaintiff's own claims or allegations, the complaint should be dismissed.  *Sprewell*, 266

25   _____

26   [16] *See Avila I* Order at 8 ("There is no indication of *when* CW 4 spoke with Defendant
     Davis about LifeLock's 'internal systems issues' and, specifically, there is no particular

27   allegation that CW 4 had any discussion with Defendant Davis about such issues *during
     the class period.  See Zucco Partners*, 552 F.3d at 997." (emphasis added)).

28

1   F.3d at 988 ("We have held that a plaintiff can – as Sprewell has done here – plead

2   himself out of a claim by including unnecessary details contrary to his claims.");

3   *Azadpour*, 2007 U.S. Dist. LEXIS 55502, at *5 (holding, in fraud case subject to

4   heightened pleading requirements of Rule 9(b), that "allegations in a complaint are

5   binding and a plaintiff can plead himself out of court by pleading facts that undermine the

6   allegations set forth in the complaint.").   The charge in SAC ¶ 118 cannot therefore save

7   the complaint from dismissal:  the Reform Act requires that any allegation of falsity must

8   be supported by particularized factual allegations, and the charge in SAC ¶ 118 is *not*

9   supported by such allegations.  *See supra* at 7 & n.11.[17]

10        **The SAC fails to particularize the extent of the alert problem:**  More generally,

11   although SAC ¶¶ 118 and 120 attempt—by alleging a 70% staleness rate—to satisfy the

12   requirement that the complaint particularize the extent of LifeLock's service outages, *see*

13   *Bien II* Order at 17,[18] the attempt is unavailing for several reasons.

14        First, as noted above, the purportedly particularized allegations (*see* SAC ¶ 120)

15   do not show that the 70% staleness rate occurred during the Class Period.  Rather, at best,

16   they show that the staleness of credit check alerts impacted customers who had the

17   Ultimate product, which did not exist during the Class Period.

18

19   _____

20   [17] While CW5—and CW4 and CW6—elsewhere allege service disruptions and stale or
     unsent (*i.e.*, "throttled") alerts during the Class Period, those allegations never mention

21   the 70% figure set forth in SAC ¶ 120 and do not otherwise allege with particularity the
     extent of the disruptions, staleness, or throttling during the Class Period.  *See* SAC ¶¶

22   121-123, 128-130, 198.  That failure to make particularized factual allegations regarding
     the extent of the alleged service problems is fatal to Plaintiffs' case.  *See Bien II* Order at
     17; *infra* at note 18.

23   [18] The *Bien II* Order required Plaintiffs to allege the *extent* of the service outages because,
     absent such an allegation, the mere allegation of service outages would not be sufficient

24   to establish that product descriptions in LifeLock's SEC filings are false and misleading
     under the securities laws.  *See Bien II* Order at 17 ("The Court cannot conclude that

25   product descriptions in LifeLock's quarterly and annual SEC filings are rendered false or
     misleading because the Company was unable to consistently deliver '24x7x365'

26   customer service or 'near real-time actionable alerts.'. . .  As discussed above, the SCAC
     fails to sufficiently allege the actual extent of LifeLock's practice of throttling . . . ."); *see*

27   *also id.* at 7.

28

Second, as this Court has previously held, LifeLock's negative disclosures—in which LifeLock warned that failure to have Company technology keep pace with corporate growth would cause service "outages" or "disruptions," *see Bien II* Order at 8, 17—negate whatever inference of falsity Plaintiffs ask the Court to draw from CW5's allegations.

Third, CW5's allegations turn in part on a vague and subjective phrase—*i.e.*, that a "huge chunk" of Ultimate customers were affected by stale credit check alerts. Even if *arguendo* CW5 had alleged that a "huge chunk" of *Ultimate Plus* (rather than "Ultimate," SAC ¶ 120) customers were affected by the *70% staleness rate for credit check alerts* (rather than by "stale credit check alerts," SAC ¶ 120), the term "huge chunk" is pure hyperbole and gives no meaningful guidance as to the extent of the customer base affected. Indeed, SAC ¶ 120 conspicuously avoids using terms that more readily indicate proportions, such as "most" or a "majority," both of which indicate a fraction of 50% or greater.

Finally, SAC ¶ 120 boils down to the assertion that a service outage affected only one item within a multi-item service package (SAC ¶ 43), where that service package was only one of three different service packages offered by LifeLock (SAC ¶¶ 42 n.3 and 43) and was purchased by only 20% of LifeLock customers (SAC ¶ 44). That assertion—to whatever extent it alleges mismanagement or even an FTC violation—is insufficient to convert a service outage into securities fraud. This conclusion is especially apt here, where LifeLock made explicit negative disclosures about service outages,[19] and where any necessary consumer redress concerning stale alerts—including stale credit check alerts—has already been made part of LifeLock's settlement with the FTC and consumers in October 2015.[20]

---

[19] *See Bien II* Order at 17 (LifeLock's negative disclosures regarding service outages negate inference of falsity); *see also id.* at 8.

[20] The other reasons-for-falsity alleged in SAC ¶ 118(a)-(c) were identically alleged in AC ¶ 112. For the reasons set forth in Defendants' motion to dismiss the Prior

(continued...)

1   **2.    No Scienter**

2   **Negative disclosures still negate an inference of scienter:**  In the first place, the

3   Second Amended Complaint does nothing to undermine the conclusion—reached

4   repeatedly by this Court in *Bien*—that LifeLock's many negative disclosures negate an

5   inference of scienter.  *See* Def. Mem. at 28-30.

6   **The CW5 allegations fail to satisfy *Zucco*:**[21]  CW5's scienter allegations mention

7   only one Individual Defendant:  Ms. Schneider.  *See* SAC ¶¶ 121, 122, 130.[22]  These

8   Schneider-related allegations similarly fail to satisfy *Zucco*.

9   **(a) Reports on stale alerts.**  CW5 allegedly created reports on stale alerts, but the

10  allegation fails for several reasons.

11  First, to the extent that the reports were allegedly sent to generic categories of

12  people such as "the executive team," "executive management," and "the highest level of

13  management," the allegation fails to particularly allege any contact between CW5 and

14  any Individual Defendant.  *See, e.g.*, *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938,

15  954 (D. Ariz. 2007) (finding CW allegations insufficient because CW1 "offers no

16  supporting facts as to the identity of 'senior management,'" and because CW2, who made

17

18  _____

19  Complaint, those reasons fail to show any falsity in the Davis statement or in the
    Schneider statement.  *See* Def. Mem. at 16-20; Reply at 3-6.  The Second Amended

20  Complaint's new allegations concerning Defendant Schneider are scienter allegations, not
    falsity allegations; none of the new allegations of the Second Amended Complaint allege

21  that, or why, the Schneider statement was false.  *See* SAC ¶¶ 118-130.

22  [21] As indicated *supra* at 1-2, 4, the Second Amended Complaint's only new CW
    allegations are those of CW5 and CW6—neither of whom was mentioned in the Prior

23  Complaint—as well as a small number of new allegations by CW4, who was mentioned
    in the Prior Complaint.  Point II.A.2 addresses the allegations of CW5 and CW6; Point

24  II.B.2 addresses the new allegations of CW4.

25  [22] CW5's Schneider-related allegations at issue appear in SAC ¶¶ 121, 122, and 130.
    Other CW5 allegations mention Ms. Schneider, but these may be disposed of in short

26  order.  SAC ¶ 82 simply repeats SAC ¶ 121.  SAC ¶ 196 does not mention any contact
    between CW5 and Ms. Schneider, thereby failing the first *Zucco* test, and does not

27  mention anything indicative of scienter, thereby failing the second *Zucco* test.  *See Avila I*
    Order at 6 (quoting *Zucco*'s two-pronged test).  SAC ¶ 198 simply reiterates the
    allegations of SAC ¶¶ 121, 122, and 130.

28

allegations about "'upper-level management,'" alleges no "facts identifying the particular members of management.").

Second, the reports at issue were never alleged to set forth the 70% staleness rate. That 70% staleness rate is what CW5 cites to establish the falsity of the Davis statement. Even if the allegation of a 70% staleness rate were to establish the falsity of the Davis statement—which it does not, *see supra* at Point II.A.1.b.—that 70% staleness rate must *also* be alleged to have been known by an Individual Defendant.  But the reports alleged by CW5 are not alleged to have included the 70% staleness rate.  *See* SAC ¶ 121. Because the reports are not alleged to have included the "fact" that assertedly renders the Davis statement false, CW5's allegations in SAC ¶ 121 are not indicative of scienter.

Third, CW5's allegations do not particularize a reliable basis for alleging that the reports were sent to and read by Ms. Schneider:

(i) The Second Amended Complaint makes contradictory allegations as to whether CW5 sent the reports to Rob Ryan (SAC ¶ 82) or to Anthony Aguilar (SAC ¶ 121).[23] That contradiction alone requires rejection of CW5's allegations.  *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012) (reliability of CW is not established where, *inter alia*, CW's allegations are internally contradictory:  "[T]he confidential witness statements in the TAC are unreliable because they contradict statements made by the same group of witnesses in the SAC. . . .  CW-2's reliability is significantly decreased given CW-2's contradictory 'verifications.'"), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *Sprewell*, 266 F.3d at 988; *Azadpour*, 2007 U.S. Dist. LEXIS 55502, at *5.

(ii) While CW5 alleges that the reports were sent to Ms. Schneider, CW5 is not alleged to have been the sender and admittedly lacks personal knowledge that the reports

---

[23] The allegation in SAC ¶ 82 that the reports were sent to Rob Ryan and to Ms. Schneider does not allege that the sending of those reports occurred during the Class Period.  Thus, the allegation in SAC ¶ 82 fails for this additional reason.  *See Avila I* Order at 8 (citing *Zucco*, 552 F.3d at 997).

were sent to Ms. Schneider.  SAC ¶ 121 (CW5's allegation that reports were sent to Ms. Schneider is alleged to have been based on Ryan's assertion rather than on CW5's first-hand knowledge).[24]  CW5's source is alleged to be Ryan (SAC ¶ 121), but the Second Amended Complaint does not establish Ryan's reliability.  Above all, the Second Amended Complaint fails to allege that Ryan even worked at LifeLock during the Class Period—which failure alone is fatal to SAC ¶ 121's allegation that the reports were sent to Ms. Schneider.  *See Avila I* Order at 8 (citing *Zucco*, 552 F.3d at 997).  Nor does the Second Amended Complaint allege any direct statement by Ryan himself or any other substantive basis for assessing Ryan's reliability (such as the date and circumstances of Ryan's assertion to CW5).[25]  In the absence of any such information regarding Ryan, the Second Amended Complaint does not establish either CW5's or Ryan's reliability with respect to the assertion that the reports were sent to Ms. Schneider.  *See Zucco*, 552 F.3d at 997 (CW's hearsay-based allegations rejected as unreliable); *Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) ("CW 7, for example, only learned that Kelly and Rive were 'actively involved in SolarCity's financials' from conversations with SolarCity's Director of Corporate Finance. . . .  Such '[k]nowledge [based] on vague hearsay . . . is not enough to satisfy [the] reliability standard.'" (citing *Zucco*, 552 F.3d at 997)); *Browning v. Amyris, Inc.*, No. 13-cv-02209-WHO, 2014 U.S. Dist. LEXIS 39549, at *69 (N.D. Cal. Mar. 24, 2014) (CW statements "may be unreliable to the extent that they rely on hearsay").

**(b) Lunch with Ms. Schneider.**  CW5's allegations that issues of staleness, shutdowns, and throttling were discussed at a lunch attended by Ms. Schneider (SAC ¶¶ 122, 130) fail to allege the extent of those problems, *see Bien II* Order at 17—let alone

---

[24] CW5's allegation in SAC ¶ 82 asserts that Ryan sent the reports to Ms. Schneider, but that allegation does not even allege a basis for CW5's knowledge.

[25] Indeed, SAC ¶ 121, which alleges that CW5 sent the reports to Aguilar, does not include any allegation explaining how the reports even got into Ryan's hands.  SAC ¶ 82 alleges that CW5 sent reports to Ryan, but does not allege that such sending occurred during the Class Period.  *See supra* note 23.

1   that the extent of those problems was raised with Ms. Schneider or discussed by her.

2   Thus, those allegations fail to particularize facts indicative of scienter.

3           **The CW6 allegations fail to satisfy *Zucco*:**  CW6's allegations in SAC ¶ 83 are

4   not indicative of scienter.  They allege only that CW6 interacted with Davis and

5   Schneider in an unspecified and apparently benign way, and that CW6 responded on Ms.

6   Schneider's behalf to complaint letters whose content is likewise unspecified and

7   apparently benign.  In any event, the content of those letters is not alleged to have been

8   shared by CW6 with Ms. Schneider.  Thus, the allegations of SAC ¶ 83 fail to satisfy

9   *Zucco*'s requirement that CW allegations be indicative of scienter.  *See Avila I* Order at 8

10  (rejecting CW4 allegation because it fails "to create an inference of scienter": "[the

11  allegation] does not establish that CW 4 specifically discussed with Defendant Davis

12  whether LifeLock alerts were 'proactive' or issued in 'near real time.'").

13          CW6's allegations in SAC ¶ 123 do not mention any contact between CW6 and

14  any Individual Defendant.  *Avila I* Order at 7 ("There are no allegations that CW 1

15  interacted with any Individual Defendant . . . .").  Furthermore, these allegations, while

16  mentioning stale alerts, fail to allege the extent of the problem.  *Bien II* Order at 17.

17

18  **B.      There Are No New Allegations That Defendant Misrepresented the "Severity" of the FTC Investigation**

19                **1.      No New Alleged Statements or Falsity Allegations**

20          The Second Amended Complaint does not allege any new Class-Period statements

21  (*see* SAC ¶¶ 151-161)[26] or any new falsity allegations (*see* SAC ¶¶ 162-164) with respect

22  to the claim that Defendants misrepresented the "severity" of the FTC investigation.

23

24  —————————————

25  [26] The Second Amended Complaint now alleges LifeLock's statement of March 17, 2014,
    which disclosed that LifeLock received, as expected, a request for information from the
26  FTC.  *See* SAC redline ¶ 155.  Defendants' motion to dismiss the Prior Complaint had
    faulted the Prior Complaint for omitting any allegation about that crucial disclosure by
27  LifeLock.  *See* Def. Mem. at 21 & n.27.

28

1

### 2. No New Scienter Allegations

2   **The new CW4 allegations still fail to satisfy *Zucco*:**  In the *Avila I* Order, this

3   Court held that the CW4 allegations in the Prior Complaint failed to raise a strong

4   inference of scienter.  *Avila I* Order at 8, 10.  In particular, this Court faulted the CW4

5   allegations for failing to state *when* a conversation between CW4 and Defendant Davis

6   occurred or to allege that the conversation occurred *during the Class* Period.  *Avila I*

7   Order at 8 (citing *Zucco*, 552 F.3d at 997).  Acknowledging the correctness of that

8   holding, the Second Amended Complaint dropped that portion of the CW4 allegations.

9   *See* SAC redline ¶ 81 (comparing AC ¶ 77).

10   The Second Amended Complaint's few new CW4 allegations make only a single

11   mention of an Individual Defendant—Ms. Schneider—but that single mention alleges

12   only a conversation that occurred *before* the Class Period.  *See* SAC ¶ 146.  Thus, the

13   CW4 allegations still fail to satisfy *Zucco*.  *Avila I* Order at 8.

14   **The CW5 and CW6 allegations are irrelevant:**  The CW5 and CW6 allegations

15   do not concern the "severity" of the FTC investigation.  *See* SAC ¶¶ 151-164.

16   **C.    The New Allegations Concerning Data Security and PCI Compliance
        Fail to Allege a False Statement or to Raise a Strong Inference of**

17   **Scienter**

18   **1.    No False Statement**

19   The Second Amended Complaint does not allege any new statements about data

20   security or PCI compliance.

21   The Second Amended Complaint does include new allegations adding detail about

22   the PCI standards and related trade customs (SAC ¶¶ 141-143) and also newly alleges

23   that LifeLock was not in compliance with these newly alleged details and trade customs

24   (SAC ¶¶ 140, 144).  But no new substance is alleged, because the Prior Complaint

25   already alleged (and the Second Amended Complaint realleges) that LifeLock at all times

26   failed to comply with the "highest levels" of PCI DSS requirements.  *See* SAC redline ¶¶

27   131, 134 (comparing AC ¶¶ 120, 123).

28

1    The Second Amended Complaint also alleges that, according to the *Ebarle*

2  declaration (*see supra* at 4 & n.3), service outages occurred on "42 different

3  weekends"—but there is no allegation that all 42 weekends were *within the Class Period*.

4  *See* SAC ¶ 149.  To the contrary, the Second Amended Complaint alleges, based on the

5  *Ebarle* declaration, that the 42 weekends fell within a period stretching "from January 1,

6  2012 to April 30, 2015."  SAC ¶ 149.  For all that appears, 41 of those 42 weekends *pre-*

7  *dated* the Class Period (and Defendants do not concede that even one occurred during the

8  Class Period).  Moreover, given that SAC ¶ 149 alleges, at worst, an unspecified number

9  of weekend outages during the Class Period, SAC ¶ 149 fails to satisfy the requirement

10  that the extent of the service disruptions must be alleged.  *See Bien II* Order at 17.

11  Finally, LifeLock already made negative disclosures about service outages and

12  disruptions.  *See id.* at 17-18.  Those negative disclosures negate any inference of falsity

13  or scienter that might otherwise be drawn from the Second Amended Complaint's

14  allegations based on the *Ebarle* declaration.  *See id.*; Def. Mem. at 28-30.

15              **2.      No Scienter**

16    With respect to data security and PCI compliance, the Second Amended

17  Complaint adds new scienter allegations, all from CW4 (*see* SAC ¶ 146).  But, as noted

18  *supra* at 17, these new allegations concern a *pre*-Class Period event.  For that reason

19  alone, the new allegations fail.  *See Avila I* Order at 8.  In any event, that pre-Class Period

20  event, which happened in "March or April 2013," was already alleged in the Prior

21  Complaint and is realleged in the Second Amended Complaint (AC ¶ 130, SAC ¶ 146).

22  The new allegations simply add detail without altering substance.  Because the allegation

23  failed to prevent dismissal of the Prior Complaint, so too it should fail to prevent

24  dismissal of the Second Amended Complaint.

25

26  **III.    THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A § 20(a)
          CLAIM**

27    The failure to allege a § 10(b) claim precludes a § 20(a) claim.  *Lipton v. Pathogenesis*

28  *Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002); *Karpov v. Insight Enters., Inc.*, No. CV 09-

1  856-PHX-SRB, 2010 WL 4867634, at *10 (D. Ariz. Nov. 16, 2010), *aff'd*, 471 F. App'x 607

2  (9th Cir. 2012).

3  **CONCLUSION**

4    For the foregoing reasons, the Second Amended Complaint should be dismissed.

5  Dated: December 16, 2016     Respectfully submitted,

6                **SACKS, RICKETTS & CASE, LLP**

7                By: /s/ Cynthia A. Ricketts

8                   Cynthia A. Ricketts

              **WILSON SONSINI GOODRICH & ROSATI**

9                Professional Corporation

              Boris Feldman (*Pro Hac Vice*)

10               Elizabeth C. Peterson (*Pro Hac Vice*)

              Gideon A. Schor (*Pro Hac Vice*)

11               *Attorneys for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kimberley C. Page (AZ#022631)
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
kpage@bffb.com

James W. Johnson
Carol C. Villegas
Barry Michael Okun
Marisa N. Demato
James T. Christie
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
cvillegas@labaton.com
bokun@labaton.com
mdemato@labaton.com
jchristie@labaton.com

Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
Peter J. Harrington
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, NY 10016
Telephone:  (212) 779-1414
Facsimile:  (212) 779-3218
bernstein@bernlieb.com
bigin@bernlieb.com
seidman@bernlieb.com
harrington@bernlieb.com

*Attorneys for Plaintiffs*

/s/Katherine Sieckman
Katherine Sieckman